**COOMER v. DURHAM et al.**

Civ. A. No. 193.

United States District Court
W. D. Virginia, Abingdon Division.
Oct. 17, 1950.

Robert T. Winston, Jr., Norton, Va., and J. N. Cridlin, Jonesville, Va., for the plaintiffs.

James L. Camblos and A. H. Sandt, Big Stone Gap, Va., for the defendants.

BARKSDALE, District Judge.

This action having been tried upon the facts by the Court without a jury, the Court doth hereby find the facts specially and state separately its conclusions of law thereon, and directs the entry of the appropriate judgment, as follows, in conformity with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.:

Findings of Fact

This is an action instituted by plaintiff, Judge Coomer, and a number of others similarly situated who assigned their claims to plaintiff Coomer for the purpose of prosecuting this action under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. The plaintiff Coomer and his assignors are all citizens and residents of the Western District of Virginia, and the principal defendant, Walter K. Durham, a building contractor, is a citizen and resident of Pennsylvania. The plaintiff and his assignors were all, at various times and at various places in Virginia and West Virginia, employees of defendant Durham, engaged in the construction, repair and remodeling of dwelling houses. Plaintiff and his assignors (hereinafter referred to as "plaintiffs"), allege that their employment was within the coverage of the Fair Labor Standards Act, that they were employed in excess of the maximum number of hours specified in the Act, and that defendant Durham has failed to compensate them for such overtime, as provided in the Act. The amount of overtime work performed by plaintiff has been stipulated, and the sole question to be determined is whether or not the labor performed by plaintiffs was within the coverage of the

Act. This action was instituted as an attachment suit in the State Court and removed to this court by defendant Durham upon the ground of diversity of citizenship.

During the period that plaintiffs were employed by defendant Durham, he was engaged in five building projects:

(1) Pursuant to contract, defendant Durham undertook for Stonega Coke & Coal Company to construct and sell eighty new houses at Keokee, Virginia, and to construct twenty new houses at Keokee for rental by Stonega to its supervisory employees. The eighty houses have been sold to persons, who, at the time of their purchases, were employed by Stonega. These purchases were financed by the First National Bank of Appalachia either by means of F.H.A. or G.I. guaranteed loans. The houses were conveyed in fee simple by deed to the purchasers without restriction as to subsequent lease or resale, and subsequent to the original purchase, some of the purchasers have sold their houses and others have rented them to persons in no way connected with Stonega.

(2) Pursuant to contract, defendant Durham undertook for Stonega Coke & Coal Company to remodel and sell 188 houses at Exeter, Virginia. At the time of the trial, June 27, 1950, 157 of these houses had been sold to employees of Stonega, conveyances having been made by deeds of bargain and sale without restrictions as to subsequent lease or resale. Subsequent to the original purchase, some of the purchasers have sold their houses to persons in no way connected with Stonega.

(3) Pursuant to contract, defendant Durham constructed for Westmoreland Coal Company eleven new houses at Cazy Creek, West Virginia, and constructed one new house and remodeled for Westmoreland an existing house in the Town of Madison, West Virginia. Westmoreland, coincident with the building of the houses at Cazy Creek and Madison, was opening a new mine at Hampton, West Virginia, at which, however, the mining operations did not begin until after the completion of the houses.

(4) Pursuant to contract, defendant Durham undertook for the Virginia Coal & Iron Company to repair and sell fifty-seven houses in the village of Andover, Virginia. These fifty-seven houses have all been sold to employees of Interstate Railroad Company, conveyances having been made by deed without restriction as to subsequent lease or resale. Subsequent to the original purchase, some of the purchasers have sold, and others have leased or have rented their houses to persons not connected with the Virginia Coal & Iron Company or Interstate Railroad Company.

(5) Pursuant to contract, defendant Durham undertook for Virginia Coal & Iron Company the construction of six new dwelling houses in the Town of Big Stone Gap, Virginia. They have all been rented to employees of Virginia Coal & Iron Company.

Stonega Coke and Coal Company is, and for many years has been, engaged in the mining and production of coal in interstate commerce. Westmoreland Coal Company is now engaged in the mining and production of coal in interstate commerce, but it did not begin the mining and production of coal until after the completion of the houses built for it by defendant Durham.

The Virginia Coal & Iron Company is a Virginia corporation which, during the period here involved, owned and leased coal and timber lands, but operated no mine, nor was it engaged in logging or shipping of forestry products. It produced no goods for shipment in interstate commerce. Interstate Railroad Company operates a railroad over which traffic moves in interstate commerce, but produces no goods for commerce. All these corporations are distinct and separate corporate entities, but there is some affiliation between them. The houses built or remodeled by defendant Durham at Keokee and Exeter are near mining operations of Stonega. Most of the people who live in these houses are employees of Stonega.

In the early days of coal mining in Southwest Virginia, it was usually necessary for coal operators to provide housing for their employees. However, with the advent of the automobile and good roads, this condition began to change. Now, most coal miners prefer to own their own homes at

528

some distance from the mines at which they are employed and travel to and fro in their own automobiles or by bus. For instance, as of May 31, 1950, at the Glenbrook operation near the village of Keokee, Stonega had 547 employees, of which number 412 lived in houses not owned by or rented from Stonega, 75 lived in the village of Keokee in houses purchased from Stonega, 42 lived in houses purchased by them in the village of Exeter, and only sixteen lived in company-owned houses. As of the same date, Stonega had a total of 3,251 employees, of which number 1,334 lived in houses rented from Stonega, 217 lived in houses purchased from the company, and 1,700 lived in their own individual houses which had never been owned by Stonega. In recent years, many large coal operating companies have sold their houses, and in starting new operations the companies have built very few houses. At all times here involved, Stonega owned and had vacant and available for rental to its employees, not less than 122 houses, and at some times in excess of 200.

Keokee, Exeter, Andover, Big Stone Gap, and Glenbrook, Ky., are not isolated communities, but are near other communities and are located on state highways which are linked with the federal highway system and are accessible by automobile and bus transportation.

I find that during the time here involved, it was not necessary for the companies here involved to provide housing for their employees.

### Conclusions of Law.

From the facts found, it is obvious that several legal questions present themselves. Of course, in determining coverage, it is not a question of what the employer's business was: the question is, what was the nature of the work done by the employee? It seems to me that the work done by the plaintiff employees here falls into three different categories: first, the work done for the Virginia Coal and Iron Company and Interstate Railroad Company; second, the work done for Stonega Coke & Coal Company, and third, the work done for Westmoreland Coal Company.

As to the work done for the Virginia Coal & Iron Company and Interstate Railroad Company, there is no question of the production of goods for commerce, as neither of these companies produced any goods for commerce. Assuming that both of them were engaged in interstate commerce, it does not follow that the plaintiff employees engaged in building or repairing dwelling houses for them were engaged in interstate commerce. It is true that employees of a company engaged in interstate commerce are often themselves engaged in interstate commerce, although their work is local in character. Thus, employees engaged in the repair and reconstruction of the instrumentalities of transportation, such as road beds, tracks and bridges, are engaged in commerce. However, dwelling houses are not instrumentalities of commerce, and I find that those employees engaged in building or repairing dwelling houses for Virginia Coal & Iron Company and Interstate Railroad Company, were not engaged in interstate commerce and therefore not covered by the Act.

As to the work done for Stonega Coke & Coal Company, of course Stonega itself was engaged in the production of goods for commerce. However, plaintiff employees produced no goods for commerce, as they were engaged in the building or repairing of dwelling houses. Plaintiffs' counsel contends that plaintiff employees in this category are covered under the provisions of 29 U.S.C.A. § 203(j). This section has been slightly amended by Act of Congress approved October 26, 1949. However, at the time of the institution of this action, the section was as follows: "(j)'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

Plaintiffs' counsel do not contend that any of the specific language in this section applies to the work done by these plaintiffs. However, it is contended that they are cov-

ered by the last clause of the section, viz.: "* * * in any process or occupation necessary to the production thereof, in any State."

[2] It is quite true that the courts have said many times that the Fair Labor Standards Act should be given a liberal construction to accomplish the declared policy of Congress, Section 202 of the Act. But it seems to me that to hold these employees covered by the above quoted language, would go beyond liberal interpretation and constitute judicial legislation. It would certainly seem anomalous to hold that it was "necessary to the production" of coal by Stonega, to build or repair these houses, when the evidence clearly shows that Stonega planned to sell nearly all these houses and did sell virtually all of them just as soon as they were completed.

It would serve no useful purpose to undertake to review all the cases which might be analogous. Plaintiffs' counsel admit that they have found no case directly in point. Some of the cases cited by plaintiffs' counsel are definitely not in point. For instance, Walling v. McCrady Const. Co., 3 Cir., 156 F.2d 932, deals with the construction of buildings for industrial plants then in operation, in which very buildings goods for commerce were to be produced. Fitzgerald Construction Co. v. Pedersen, 324 U.S. 720, 65 S.Ct. 892, 89 L.Ed. 1316, deals with the repair of abutments and substructures of bridges on which were laid railroad tracks used in interstate transportation. McComb v. Dobson, D.C., 77 F.Supp. 1, also deals with the repair of facilities actually used in interstate commerce. Walling v. Hamner, D.C., 64 F.Supp. 690, deals with the production of mine props and timbers, which are, of course, absolutely essential to mining operations. Of the two "cook house" cases cited by plaintiffs' counsel, one tends to support plaintiffs' contention and the other is directly against them.

I am much more impressed by the reasoning of Judge Timmerman in Morris v. Beaumont Manufacturing Co., D.C., 84 F.Supp. 909. In that case, plaintiffs were engaged in the construction, maintenance and repair of residences owned by the employer and rented to its employees. It seems to me that the factual situation there was much more favorable to the employees than the facts presented here, yet Judge Timmerman, in a well reasoned opinion, held that these employees were not engaged in the production of goods for commerce. I conclude that plaintiff employees engaged in the building of dwelling houses for Stonega, were not covered by the Act.

As to the work done for Westmoreland Coal Company, the conclusion I have reached in regard to the work done for Stonega Company, also applies to this situation, and it seems to me that plaintiffs' contentions must fail here for the additional reason that the work done for Westmoreland was new construction and was completed before the production of any goods for commerce by Westmoreland. The doctrine that new construction, even though intended for use in commerce, does not constitute interstate commerce until so utilized, was recognized in Ritch v. Puget Sound Bridge & Dredging Co., 9 Cir., 156 F.2d 334. See also Crabb v. Welden Bros., 8 Cir., 164 F.2d 797; Pedersen v. Delaware L. & W. R. Co., 229 U.S. 146, 33 S.Ct. 648, 57 L.Ed. 1125; Nieves v. Standard Dredging Corp., 1 Cir., 152 F.2d 719.

This doctrine has also been recognized by the Wage and Hour Division of the Department of Labor. In Paragraph 12 of Bulletin 5 of December 1939, it is said: "The employees of local construction contractors generally are not engaged in interstate commerce and do not produce any goods which are shipped or sold across state lines. Thus it is our opinion that employees engaged in original construction of buildings are not generally within the scope of the Act, even if the building when completed will be used 'to produce goods for commerce'."

Consequently, I conclude that none of the employee plaintiffs were covered by the Act, and therefore that this action must be dismissed at the costs of the plaintiffs. An order will be entered accordingly.